RAND BEVERAGE COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30250. Promulgated May 13, 1952.

*E. C. Eichenbaum, Esq.*, and *W. S. Miller, Jr., Esq.*, for the petitioner.

*Allen Akin, Esq.*, for the respondent.

OPINION.

Rice, *Judge:* In its application for relief and in its petition, petitioner claimed relief under section 722 (b) (5) but did not press such claim in its brief. Since the facts of record do not indicate that any relief under subsection (b) (5) is warranted, relief under such provision is denied. *Del Mar Turf Club,* 16 T. C. 749 (1951).

This leaves for our consideration (1) whether peitioner qualifies for relief under subsection (b) (4); (2) whether it is entitled to use the "2-year push-back rule"; and (3) if (1) and (2) are answered in the affirmative, what is a fair and just amount representing normal earnings of the petitioner to be used as a constructive average base period net income.

Petitioner commenced business in April 1937 and therefore has one of the qualifying factors required by section 722 (b) (4).[5] We have found as a fact that petitioner's average base period net income is an inadequate standard of normal earnings. Petitioner also claims that the change from the promotion of a nationally franchised drink to a drink developed by petitioner and bearing its own brand name con-

---

[5] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

* * * * * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, or

* * * * * * *

stituted a difference in the products furnished under section 722 (b) (4). Respondent denies that such change was a change in the character of the business within the meaning of the statute. Whether or not it constituted a change in the character of the business need not be decided in this case because it is an alternative qualifying provision under the statute; and since petitioner meets the other qualifying factor, commencement of business in the base period, it is not necessary for it to meet the alternative qualifying factor also. This is not to say, however, that production and sale of the new-drink line are not to be considered in a reconstruction of average base period net income.

Petitioner's excess profits credit was computed on the invested capital method and resulted in credits in the following amounts:

| | |
|---|---|
| 1943 | $903. 27 |
| 1944 | 1, 577. 23 |
| 1945 | 2, 755. 17 |

Petitioner's net profits and net losses for the years 1937 through 1939 were as follows:

| | |
|---|---|
| 1937 | $802. 95 loss |
| 1938 | 1, 785. 32 loss |
| 1939 | 3, 054. 97 profit |

If the business of a taxpayer does not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business 2 years before it did so, it is deemed to have commenced the business at such earlier time. Sec. 722 (b) (4), *supra*.

Petitioner's formative years followed the pattern of the industry of which it is a member. Two of petitioner's witnesses were engaged in the production of carbonated beverages in the Little Rock area in competition with petitioner. One of the witnesses was the manager and a partner of the 7-Up Orange Crush Beverage Company and had been engaged in the business since 1926. The other witness was the president and manager of the Dr. Pepper Bottling Company and had been in the business for 20 years. The testimony of said witnesses was to the effect that a normal development period for a new company similar to petitioner would be not less than 4 years and probably more. They both testified that the volume of increase in sales claimed in petitioner's reconstruction was reasonable in their opinion, and less than they had experienced under similar circumstances. We have found as a fact that petitioner had a normal development period of between four and five years, and that it did not reach by the end of the base period the earning level that would have been reached if the business had commenced in 1935 instead of 1937; and we, therefore, conclude that petitioner qualifies for relief under section 722 (b) (4) and is entitled to use "the 2-year push-back rule" in reconstructing its average base period net income.

Respondent argues that petitioner's failure to qualify for relief is shown, in part at least, by the fact that it sustained a net loss of $814.61 in 1940, and realized a net profit of only $3,554.01 in 1941. Assuming that these facts may be considered, we do not agree that they disqualify petitioner from relief under subsection (b) (4). Petitioner's development period, as pointed out above, was between four and five years; and its fifth year of existence—1941—saw it continuing to experience some development difficulties. The loss in 1940 and the comparatively small net profit in 1941 tend to corroborate our conclusion that petitioner had not reached its normal earning level during its last base period year.

We then come to our final question—"What is a fair and just amount representing normal earnings of the petitioner during the base period?" Both parties submitted reconstructions of average base period net income using the "2-year push-back rule." Petitioner's reconstruction arrived at an average figure of $10,170.49. Respondent's reconstruction showed a net loss of $10,211.78 for the last base period year. The main or basic differences between the two reconstructions related to the reconstruction of sales and the different treatment accorded certain bottle losses, interest expense, and bad debts. Petitioner reconstructed a sales volume for 1939 in the amount of $96,852.10. Respondent allowed the sum of $80,000. The figures used for cost of materials, factory labor, overhead, selling, delivery, and administrative expenses did not vary greatly in either reconstruction. Respondent added the following deductions as expenses:

| | |
|---|---:|
| Additional bottle-loss depreciation | $8, 405. 55 |
| Interest expenses | 3, 434. 98 |
| Bad debts | 2, 596. 00 |
| Total | $14, 436. 53 |

Petitioner's reconstruction allowed no deduction for interest and allowed $4,842.60 as a deduction for bottle and case loss and for bad debts. This figure is 5 per cent of reconstructed gross sales.

Petitioner's reconstruction of expenses, other than the three just mentioned, was somewhat lower than the survey of cost averages prepared by the American Bottlers of Carbonated Beverages set out in our findings of fact; and although one of petitioner's expert witnesses testified that such cost averages for the base period years were a reliable index of costs in the carbonated beverage industry, such indices are national in scope and do not necessarily reflect to the last penny the costs of many local businesses in the industry.

With respect to bottle and case loss, both of petitioner's expert witnesses testified that 5 per cent of sales was a reasonable figure for such loss, which is about three and one-half cents a case. With respect to the bad debt loss, it must be remembered that petitioner

was attempting to break into a highly competitive business. The only market available for the petitioner's products (other than the franchised drink on which it claims no reconstructed increases in sales) was dependent upon its ability to capture a portion of the demand that was already being supplied by other members of the industry. Because of this intense competition, petitioner during the base period years sold its beverages on a consignment basis. Petitioner's competitors were on a strictly cash basis with their customers, and required them to make a deposit on all cases of drinks left with them. Petitioner did not require a deposit from its customers, and it did not charge off any uncollectible amounts during the base period years arising out of such consignment practice.

In 1942, petitioner wrote off bad dabts in the amount of $15,665.04 with the explanation in its income tax return that it represented approximately 3,200 different small accounts which were uncollectible. It also changed its credit policy at that time, selling its merchandise for cash only, and requiring cash deposits on its cases and bottles in conformity with the practices of its competitors.

The record shows that the normal practice in petitioner's industry was to sell its product on a cash basis rather than on a consignment basis; but it also shows that it was normal practice for petitioner to sell on the consignment basis. In seeking normality in a reconstruction, it is appropriate to give consideration and effect to any special circumstances peculiar to the specific taxpayer where such circumstances are normal for such taxpayer even though they might not be normal for another taxpayer engaged in the same business.

Our last item of expense is interest. Petitioner was indebted to Roy F. Rand and the Economy Wholesale Grocery (owned by Rand) in the amounts of $24,372.67, $53,338.06, and $61,168.21 for the years 1937, 1938, and 1939, respectively. No deduction for interest on this indebtedness was claimed on petitioner's tax returns for those years. The respondent claims that interest on borrowed money is a normal business expense, and included in his reconstruction for petitioner's last base period year an amount of 6 per cent of the indebtedness as an additional expense. Petitioner argues that no interest (or, at most, a nominal amount) was owed on this indebtedness, and that interest which does not exist in fact is not a proper item to be considered in a reconstruction of normal earnings. While, generally speaking, interest is an ordinary and normal expense of business, it is not unusual or abnormal for the chief stockholder of a corporation to lend money to it in its formative years, or when it gets in financial difficulties, without requiring interest payments on such loans.

As shown in our findings of fact, petitioner used an index from statistics of nonalcoholic beverages, published in the Treasury Depart-

ment's "Statistics of Income." Respondent argues that this is not a proper index for such purpose because of a reclassification in 1938 resulting in statistics for 1936 and 1937 not being comparable with those for 1938 and 1939. In support of this argument, he cites Treasury Department's "Statistics of Income for 1938, Part 2," pp. 256 and 266, which shows that in adopting a standard Industry Classification in 1938, reports of manufacturers of cider and mineral or spring water, classified in 1936 and 1937 under nonalcoholic beverages, were shifted to "Other Food, Including Flavoring Sirups," while mineral and spring-water bottling was shifted to "Wholesale Trade." We agree with respondent that use of such index is not warranted by this record when compared with the other indices set out in our findings of fact.

Petitioner argues that the official compilation in "Statistics of Income" for all income tax returns filed by all manufacturers of nonalcoholic beverages shows a national, average net income of 14.1 per cent of sales for the year 1939, and a base period, average net profit of 16.4 per cent of sales. It also points to the testimony of the two expert witnesses, one of whom testified that a net profit before taxes of 8 cents to 15 cents a case, was normal during the base period; and the testimony of the other witness who said that a range of 10 cents to 15 cents a case was normal. In petitioner's reconstruction he claimed a net profit of 9.57 per cent of sales which amounts to 6.7 cents a case.

We, therefore, conclude, based upon the entire record of this case, that petitioner is entitled to use a reconstructed average base period net income in the sum of $5,700. In arriving at such amount, we have considered carefully all the facts of record including the bottle loss, bad debt loss, and interest, and have accorded to each of the items the treatment we consider appropriate.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*